J-A28029-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JOYCE KOROL, ADMINISTRATOR OF THE ESTATE OF THOMAS PHILLIP KOROL, DECEASED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | No. 1373 EDA 2022 |
| | : | |
| AURORA PUMP COMPANY; BON L. MANUFACTURING (INDIVIDUALLY AND AS SUCCESSOR-BY-MERGER TO CAPITOL PRODUCTS CORPORATION, SUCCESSOR-IN-INTEREST TO DAVIS ENGINEERING COMPANY); BW/IP INTERNATIONAL, INC. (SUED INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO BYRON JACKSON PUMP COMPANY); CARRIER CORPORATION; CLEAVER-BROOKS, INC. (F/K/A AQUA-CHEM, INC. D/B/A CLEAVER-BROOKS DIVISION, INDIVIDUALLY AND AS SUCCESSOR-IN-INTERST TO DAVIS ENGINEERING COMPANY) CRANE CO. (SUED INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO COCHRANE CORPORATION); CRANE ENVIRONMENTAL, INC. (SUED INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO COCHRANE CORPORATION); CROWN CORK AND SEAL COMPANY, INC.; DURABLA MANUFACTURING COMPANY; FLOWERSERVE US, INC. (SUED AS SUCCESSOR TO BW/IP INTERNATIONAL, INC. SUCCESSOR-IN-INTEREST TO BYRON JACKSON PUMP COMPANY); GENERAL ELECTRIC COMPANY; THE GOODYEAR TIRE AND RUBBER | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | |

COMPANY (SUED INDIVIDUALLY AND   :
AS SUCCESSOR TO DURABLA   :
MANUFACTURING); GREEN, TWEED   :
AND CO., INC.; IMO INDUSTRIES,   :
INC. (SUED INDIVIDUALLY AND AS   :
SUCCESSOR-IN-INTEREST TO   :
DELAVAL TURBINE, INC.; INGERSOLL   :
RAND COMPANY; JOHN CRANE, INC.;   :
THE NASH ENGINEERING COMPANY;   :
PECORA CORPORATION; SUPERIOR-   :
LIDGERWOOD-MUNDY   :
CORPORATION (SUED INDIVIDUALLY   :
AND AS SUCCESSOR-IN-INTEREST   :
TO M.T. DAVIDSON); WARREN   :
PUMPS, LLC.

Appeal from the Order Entered April 26, 2022
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 190301223

BEFORE: PANELLA, P.J., LAZARUS, J., and SULLIVAN, J.

MEMORANDUM BY LAZARUS, J.:        **FILED FEBRUARY 14, 2023**

Appellant Joyce Korol, Administrator of the Estate of Thomas Phillip Korol (Decedent), appeals from the order, entered in the Court of Common Pleas of Philadelphia County, granting summary judgment in favor of Appellees Crane Company (Crane) and Warren Pump Company (Warren) (collectively, Defendants). After careful review, we reverse and remand for further proceedings.

Decedent was diagnosed, post-mortem, with malignant mesothelioma on June 13, 2017.[1] Decedent had served as a United States Navy fireman

---

[1] Decedent died on June 11, 2017, and his diagnosis was confirmed during an autopsy. Decedent had been scheduled for a lung biopsy on June 2, 2017, but was unable to proceed with the procedure. **See** Plaintiff's Answers to Interrogatories, at 3.

and fireman's apprentice aboard the U.S.S. Dahlgren from 1961 to 1963. During his service, Decedent was allegedly exposed to asbestos while working with valves manufactured and sold by Crane[2] and pumps sold by Warren.[3] On March 8, 2019, Appellant filed a complaint[4] against Defendants alleging that Decedent's diagnosis of mesothelioma was caused, in part, from his asbestos exposure to Defendants' products while working on the Navy vessel.

To support her cause of action, Appellant relied on the testimony of David Anthony Warren (David),[5] Gene Brown, and Charles Clay, who also

_____

[2] Although the valves were made exclusively of metal, individuals were exposed to asbestos through external packing and insulation associated with the valves. Similar to the process with pumps, *see infra* at n.3, if there was a leak around the shaft of a valve, a sailor would often have to replace the packing by first taking off the nuts or bolts on the valve, remove the old packing, and put in a new piece of packing. *See* Deposition Testimony of David Anthony Warren, 4/7/20, at 64. Oftentimes the old packing was not easily removed so "you'd have to take a little pick and pick it all out and just get it clean." *Id.*

[3] The pumps contained asbestos components, including rope packing, insulation, and gaskets. In order to repair a leaking pump, a worker would turn the pump off, take out all the bolts, and then either pry apart the pipe or move the pump out of the way to get to the flange. Then, they would scrape out what was left of the old gasket by using a wire brush or putty knife, put on a new gasket, and bolt it back together. *Id.* at 36-37, 44-45, 51. However, sometimes the seal around the bolt holes was not good, so the sailors would have to cut new gaskets for the flanges on the pumps. *Id.* at 42. The gasket material came in rolls and sheets. *Id.* at 48-49.

[4] Decedent smoked cigarettes "from approximately the 1960s to 2009. During this time the most he smoked was approximately one (1) pack per day." Complaint, 3/8/19, at 12.

[5] To minimize confusion between deponent David Anthony Warren and Warren Pumps, we will refer to the individual as David throughout this memorandum.

- 3 -

served aboard the U.S.S. Dahlgren during the time Decedent was onboard the ship. David "occasionally" worked with Decedent in a fireroom aboard the vessel and identified pumps in the ship's engine rooms as being manufactured by Warren and some valves on the ship (in either engine rooms or firerooms) as being manufactured by Crane. Deposition of David Anthony Warren, 4/7/20, at 21-22, 28-30. In the two to three months he worked in the fireroom with Decedent, David never saw Decedent work on any pump or anyone else working on a pump in Decedent's presence. However, David testified that "if you worked in the fireroom or the engine room, you packed valves and you packed pumps." Deposition of David Anthony Warren, 4/7/20, at 59:3-12.

Although Brown and Clay testified that they did not specifically remember Decedent from their time aboard the U.S.S. Dahlgren, Brown recalled Crane valves in the firerooms of the Dahlgren and Clay remembered seeing "quite a few" Warren pumps in the boiler rooms onboard the ship.

Appellant also offered a naval expert report, authored by Captain Arnold Moore, indicating that Warren provided asbestos-containing replacement parts for the pumps on overhauls of Navy ships, although the report did not include any specific information regarding the replacement or overhaul of pumps on the U.S.S. Dahlgren.

Crane and Warren filed motions for summary judgment alleging Appellant had not produced sufficient evidence to establish that Decedent was exposed to asbestos-containing products linked to their companies or that

such exposure was sufficient to cause Decedent's mesothelioma. Specifically, Defendants argued that none of the testimony of Decedent's former Navy co-workers, who were offered as fact witnesses, established that they ever saw the Decedent work on a Warren pump or Crane valve or saw anyone work on a Warren pump or Crane valve in the vicinity of Decedent. *See* Warren Pump Company's Motion for Summary Judgment, 8/25/21, at I; Crane Company's Motion for Summary Judgment, 8/24/21, at I. Defendants noted that while Clay and Brown testified about the duties of a fireman and fireman apprentice (specifically repair work done to valves and pumps in the firerooms) on the U.S.S. Dahlgren during the time Decedent served on the vessel, and that they recalled that some Crane valves and Warren pumps were used on the U.S.S. Dahlgren,[6] neither Clay nor Brown specifically remembered Decedent or recalled serving with him on the U.S.S. Dahlgren.

On March 7, 2022, and March 8, 2022, the trial court granted Defendants' motions, concluding that "[t]here are no genuine issues of material fact in this case because [Appellant] solely relies on speculative evidence . . . [that would] "require a jury to improperly speculate as to whether [Decedent] actually performed the tasks described by his coworkers, e.g., replacing the insulant in valves and pumps." Trial Court Opinion, 7/5/22,

at 4. On April 26, 2022, the case settled with regard to all remaining non-bankrupt parties.[7]

On May 19, 2022, Appellant filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Appellant raises the following issues:

(1)     Did the trial court abuse its discretion or commit an error of law in granting [] Crane[]'s summary judgment against [Appellant], even though [Appellant's] proffered evidence establishes, at a minimum, the existence of a material fact question on the element of proof—exposure—challenged by []Crane[]'s[8] summary judgment motion?

(2)     Did the trial court abuse its discretion or commit an error of law in granting []Warren['s] summary judgment against [Appellant], even though [Appellant's] proffered evidence establishes, at a minimum, the existence of a material fact question on the element of proof—exposure— challenged by []Warren['s] summary judgment motion?

Appellant's Brief, at 5.

---

[7] The court also noted that the case was dismissed against the Manville Personal Injury Settlement Trust (Fund) without prejudice, to be reopened as an arbitration matter. In a response to this Court's July 18, 2022 rule to show cause, Appellant recognized that the Fund had not been added as a third party and the trial court never directed the matter to arbitration. We find that this is a final, appealable order that dismisses all claims and all parties. *See* ***Shellengerger v Kreider Dairy Farms, Inc.***, -- A.3d --, 2023 PA Super 1, at *9 n.6 (Pa. Super. 2023) (deeming notice of appeal timely where order became "final and appealable . . . upon the trial court's entry of order declaring the case settled as to all non-bankrupt parties, with the exception of the dismissal of one defendant without prejudice to be reopened as an arbitration matter").

[8] Crane has not filed a brief on appeal.

"Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear:  the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion."  **Shellenberger**, **supra** at *10 (citation omitted).  **See also Gregg v. V-J Auto Parts Co.**, 943 A.2d 216, 221 (Pa. 2007).

In passing upon a motion for summary judgment, the court must "accept as true all well[-]pleaded facts in the plaintiff's complaint, and give the plaintiff the benefit of all reasonable inferences to be drawn therefrom." **Eckenrod v. GAF Corp.**, 544 A.2d 50, 52 (Pa. Super. 1988).  A motion for summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." **Fiffick v. GAF Corp.**, 603 A.3d 208, 209 (Pa. Super. 1992).  To defeat the motion, the non-moving party must come forth with evidence showing the existence of the facts essential to the cause of action.  Pa.R.C.P. 1035.2,[9] Note.

_____

[9] Pursuant to Pennsylvania Rule of Civil Procedure 1035.2, a motion for summary judgment shall be granted

> if, after the completion of discovery relevant to the motion, including the production of expert reports, [the non-moving] party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action . . . which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P.1035.2(2).

- 7 -

In the context of asbestos litigation, whether a plaintiff can successfully defeat a motion for summary judgment by using circumstantial evidence depends upon the frequency of the use of the product and the regularity of plaintiff's employment in proximity thereto. *Eckenrod*, *supra* at 53 (citation omitted). A plaintiff must establish more than the presence of asbestos in the workplace; he must prove that he worked in the vicinity of the product's use. *Id.* at 52. Courts should apply the *Eckenrod* standard in a way tailored to the facts and circumstances of the case. *Linster v. Allied Signal, Inc.*, 21 A.3d 220, 224 (Pa. Super. 2011). "Application of the test becomes less stringent where the plaintiff produces specific evidence of exposure to a defendant's product." *Id.* Finally, in cases involving mesothelioma, "which can develop after only after minor exposure to asbestos fibers[,] . . . the frequency and regularity requirements become less cumbersome" *Id.*

In *Estate of Hicks v. Dana Cos.*, 984 A.2d 943 (Pa. Super 2009), our Court reiterated:

> It is appropriate for courts, at the summary judgment stage, to make a reasoned assessment concerning whether, in light of the evidence concerning **frequency, regularity, and proximity** of a plaintiff's [] asserted asbestos exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between the defendant's product and the asserted injury.

*Id.* at 954 (emphasis added), citing *Gregg*, *supra* at 227.

Appellant claims that summary judgment was improperly granted where evidence established that Decedent worked on or around asbestos-containing valves and pumps that Defendants manufactured, sold, or supplied aboard the

- 8 -

Dahlgren and where he was exposed to asbestos fibers from those products. Appellant's Brief, at 43. More specifically, Appellant argues that under the appropriate summary judgment standard, the "evidence establishes, at a minimum, a legitimate question of fact regarding whether [Decedent] as a fireman and fireman's apprentice aboard the Dahlgren . . ., worked on the Defendant's respective asbestos-containing pumps, valves[,] and tanks and, as a result[,] inhaled asbestos fibers from such products when [Decedent], and others working in the same vicinity, removed and replaced gaskets and packing associated with those products." *Id.* at 44. We agree.

In its brief, Warren cites *Krauss v. Trane U.S. Inc.*, 104 A.3d 556 (Pa. Super. 2014), to support the position that Appellant "failed to demonstrate that [Decedent] was exposed to asbestos from a Warren pump on a frequent, regular[,] and proximate basis." Appellee's Brief, at 10. In *Krauss*, the decedent had worked as a bricklayer at various jobsites for five years and, during the course of his employment, had been exposed to asbestos-containing products (turbines, boilers, pumps, joint compound, spackling, and adhesive products) manufactured by defendants. Decedent's executrix filed a lawsuit claiming that while at the various jobsites, decedent got asbestos on his clothes and hair and in his lungs, and, as a result, contracted mesothelioma. The *Krauss* defendants filed motions for summary judgment arguing that plaintiff failed to provide sufficient evidence showing that decedent had frequent, regular, and proximate exposure to their asbestos products. The court granted the defendants' motions; plaintiff appealed.

On appeal, our Court affirmed the summary judgment orders, finding that an affidavit of one of the decedent's bricklaying co-workers was insufficient to raise genuine issues of material fact regarding decedent's frequent, regular, and proximate exposure to the asbestos-containing products where the co-worker's testimony consisted of the following facts:  he worked with decedent at various jobsites; the jobsites had turbines, boilers, and pumps manufactured by several defendants; the turbines, boilers, and pumps were insulated with heat-resistant asbestos products; the products created a "great deal of visible dust . . . [t]hat got on [their] clothing, in [their] hair[,] and in [their] lungs;" and that they "were never given any warning that the inhalation of asbestos fibers could be hazardous to [their] health." *Id.* at 566.

In concluding that decedent's executrix had failed to establish that the defendant's products were the cause of decedent's injury, the Court noted that affidavits provided by lay witnesses "recalled all of these products being present at the various worksites where [the co-worker] worked with [d]ecedent," *id.*, but "provide[d] **no specific evidence that [d]ecedent was exposed to a product manufactured by a particular manufacturer or supplier at a particular worksite** [and that] the affidavit fail[ed] to establish with any certainty that these products contained asbestos." *Id.* at 567 (emphasis added).  In addition to the issue of whether the defendants' products actually contained asbestos, the panel also considered whether there was a genuine issue regarding a causal connection between any of the

defendants' products and the decedent's disease (i.e., the "frequency, regularity, proximity test"). In concluding that the evidence was insufficient to show this link, the Court noted that the decedent's co-worker's affidavit did not identify the length of time that he and the decedent were exposed to the allege asbestos-containing products at the various worksites or the decedent's proximity to the products with which he worked. *Id.* At most, the evidence established that decedent was "approximately twenty-five to thirty-five feet away from the turbines [and that he] never actually got right up next to one of them." *Id.* at 570. Thus, the Court concluded that the executrix failed to establish a genuine issue of material fact that the decedent "inhaled asbestos fibers from a [defendant's] turbine due to regular and frequent exposure in close proximity to the product." *Id.*

Similarly, in *Eckenrod*, *supra*, deposition testimony showed that decedent was "exposed to asbestos products, [but] none [of the witnesses] clarified the proximity of the products to the workers or that the [defendants] were the manufacturers/suppliers of the products being used." 544 A.2d at 52-53. Specifically, appellant presented traveling requisition forms identifying both defendant companies as suppliers of products to the decedent's employer and also the testimony of three of decedent's co-workers who indicated that they had worked with decedent "upon occasion" at the employer's facility. However, "none [of the testimony] stated that the **decedent worked exclusively or continuously at the [facility's] furnace during his period of employment** [and none] elaborated on the nature or length of

[decedent's] exposure [to asbestos products] **or the brand of the products available**." *Id.* at 53 (emphasis added). "In fact, the only testimony as to the identification of *any* of the products came from the depositions of distributors of the asbestos products and one main plant storeroom employee[.] Each of these individuals' depositions indicated that various [defendants] sold asbestos products to [decedent's employer], but d[id] not establish **where the specific product was used** or that [decedent]" came into contact with an identifiable product. *Id.* (emphasis in original and added). Confronted with evidence of "little more than proof that the offending product was shipped into the plant, [this Court found that there was] 'not even a reasonable inference that [decedent] was exposed to [defendants'] asbestos products.'" *Id.*

We find that the facts and circumstances in the instant case are markedly different than those in *Krauss* and *Eckenrod* and, thus, compel a different result. In *Krauss* and *Eckenrod*, plaintiffs failed to establish: the exclusivity or continuity of where decedents carried out their duties in the workplace; the specific manufacturer of the alleged asbestos-containing products decedents were exposed to; where the specific products were used at the workplace; the length of decedents' exposure to the products; and the available brand of products at decedents' workplace. By contrast, Appellant supported her cause of action upon the following facts of record:

- Decedent worked as a fireman and fireman's apprentice aboard the U.S.S. Dahlgren from 1961-1963;

- 12 -

- Decedent worked in two of the vessel's firerooms and two of its engine rooms during his time onboard;

- David worked with Decedent "for a short period of time in the fireroom" of the U.S.S. Dahlgren. Deposition of David Anthony Warren, 4/7/20, at 7;[10]

- The confines of the engineering rooms and firerooms were "tight," **see id.** at 22 (testifying with regard to engine rooms, "It would be kind of hard not to be close to them because it's kind of a cramped space and [in] a lot of places . . . you would have to turn sideways if you passed [another of your shipmates]."); **id.** at 34-35 (David testifying firerooms also were "close quarters" like engine rooms);

- While working in the engineering rooms, sailors' duties included removing and replacing asbestos packing and gaskets on pumps and seal rings on valves;

- Removing and replacing the packing of pumps and valves sometimes required sailors to scrape gaskets from metal surfaces, which created dust that they would have breathed in while working;

- Anyone who worked in the fireroom and engine rooms would have been close to someone scraping a gasket or would, himself, have been scraping a gasket such that he would have breathed in particles in the air. **See id.** at 70;

- When working in the fireroom or the engine rooms sailors packed valves and pumps, an average of one to two times per month. **Id.** at 54, 59;

- David identified pumps in the ship's engine rooms as being manufactured by Warren and some valves on the ship (in either engine

---

[10] **See** David Anthony Warren Deposition, 4/7/20, at 31 ("[O]ccasionally my job would take me into [the Decedent's] space, or, you know, we would correspond in the chow line."); **id.** at 7 ("I knew [Decedent] in the fireroom briefly[.] I worked with him for a short period of time in the fireroom until I moved over to M-Division and he remained in the fireroom."); **id.** at 85 ("I was briefly in the fireroom with [Decedent] and I left to [go to] the engine room."); **id.** at 86 ("But in the fireroom is where I met [Decedent] for the first time and g[o]t to know a little bit about him.").

rooms or firerooms) as being manufactured by Crane. *Id.* at 21-22, 28-30;

- David "never actually saw [the Decedent] actually removing one [of the gaskets in connection with the pumps when he was working aboard the U.S.S. Dahlgren,] but if you were a fireman, you're going to do gaskets." *Id.* at 44;

- In the engine rooms and firerooms, it was "possible" that other sailors would be working around you when you were scraping the flanges to put on the new gaskets, *id.* at 44, and there would be other people around you working on packing the pumps and sometimes they would blow the packing out. *Id.* at 59;

- The process of scraping gaskets and packing valves exposed firemen and enginemen to dust and debris that was released into the air from the process. *Id.* at 70 ("Well, if [Decedent] worked in the fireroom as he did the engine room and he was close to somebody scraping a gasket or he scraped them, yes, he would have been close to those particles.");

- Brown remembered seeing some Crane valves in the ship's firerooms. *See* Deposition Testimony of Gene Brown, 3/24/21, at 39; and

- Clay testified Warren sounded familiar as the manufacturer of pumps aboard U.S.S. Dahlgren and recalled seeing the Warren name on casting of "quite a few" pumps on ship. *See* Deposition Testimony of Charles Clay, 4/21/21, at 23.

Taken collectively, we conclude that Appellant has presented sufficient evidence to create a material issue of fact as to the regularity or nature of Decedent's contact with Defendants' products while he worked aboard the U.S.S. Dahlgren. In *Weible v. Allied Signal, Inc.*, 963 A.2d 521 (Pa. Super. 2008), our Court reversed summary judgment in favor of defendants where garage mechanics, who recalled having had contact with decedent, testified that they removed and replaced clutches, brakes, and gaskets, that the process of removing and replacing those products produced asbestos dust, and recalled using defendants' specific products. Similarly, in *Linster*, *supra*,

our Court reversed the trial court's grant of summary judgment to defendants where "the facts and circumstances . . . [were] sufficient to establish the required product identification and causal connection between the [decedent's] mesothelioma and [the specific defendant's] gaskets and packing . . . [even though the decedent] may have worked with other brands (which potentially contained asbestos)[.]" *Id.* at 229. There, the decedent also worked on a Navy ship, "primarily . . . in the engine and fire rooms where there was poor ventilation" and the environment was described as "cramped conditions [where tradesmen] were 'on top of' other tradesmen[.]" *Id.* at 224. In addition to the deposition testimony of the decedent, appellant offered the testimony of three of the decedent's former co-workers on Navy ships, who testified that they worked together in the same "space" in the fire and engine rooms or "in the same vicinity 'numerous times' with [decedent]." *Id.* at 225-27. In concluding the facts established the essential elements of the appellant's *prima facie* case, our Court reiterated the **Weible** Court's edict that, at the summary judgment stage, "[p]inpoint precision in the proofs may be desired, but it is not required." *Id.* (quoting **Weible**, **supra** at 553).

Here the record evidence shows that: Decedent worked as a fireman and fireman's apprentice in the firerooms and engine rooms on the U.S.S. Dahlgren for a period of 28 months; those rooms contained pumps and valves manufactured by Warren and Crane, respectively; in those rooms, sailors often removed and replaced asbestos packing and gaskets on pumps and seal rings on valves by scraping the gaskets from metal surfaces; the scraping

- 15 -

created dust (asbestos fibers) that were released into the air; the confines of the fire rooms and engine rooms were extremely tight; and, because of the close quarters, anyone who worked in the firerooms and engine rooms would have been very close to someone scraping a gasket or would, himself, have been scraping a gasket such that he would have breathed in the asbestos particles. **See Andaloro v. Armstrong World Industries, Inc.**, 799 A.2d 71, 86 (Pa. Super. 2002) (to make out "*prima facie* case, it is well established that the plaintiff must present evidence that he inhaled some asbestos fibers shed by the specific manufacturer's product").

Given the record before us, we conclude that the trial court erred in granting summary where the facts sufficiently identified Defendants' products and Decedent's exposure to them. We simply cannot conclude that this case is so clear and free from doubt that Warren and Crane were entitled to judgment as a matter of law. **Fiffick**, **supra**. Therefore, viewing the evidence in the light most favorable to Appellant, as we must, we conclude that Appellant is entitled to present, to a jury, the issue of whether there is a sufficient causal connection between the Defendants' products and Decedent's mesothelioma. **See Linster**, **supra** at 229 (even though decedent may have worked with other brands of asbestos-containing products, sufficiency of appellant's proof with respect to manufacturer's products not affected and survived summary judgment phase). Accordingly, we reverse the order granting summary judgment, and remand for further proceedings. **See Harahan v. AC & S, Inc.**, 816 A.2d 296, 297-98 (Pa. Super. 2003)

(deposition testimony by decedent's co-workers provided circumstantial and direct evidence to show genuine issue of material fact as to whether defendant's asbestos-containing product caused decedent's disease where product was "used everywhere" in workplace and where co-workers testified they and decedent all breathed dust created from the product "on a regular basis").

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/14/2023