Patricia LINSTER, Administratrix of
the Estate of Matthew Linster and
in Her Own Right, Appellant

v.

ALLIED SIGNAL, INC., Pneumo Abex
Corporation, Anchor Packing Compa-
ny, Inc., Asbestos Corporation, Ltd.,
Asbestos Insulation Company, Inc.,
A.W. Chesterton, Inc., Bayer Cropsci-
ence, Inc., Bell Asbestos Mines, Ltd.,
Brand Insulations, Inc., BNS Co., Buf-
falo Pump Company, Burnham Hold-
ings, Certainteed Corporation, Cleaver
Brooks, Co., Crane Co., Demming Di-
vision, Crane Packing, Crown Cork &
Seal Company, Inc., Dana Corpora-
tion, Durabla, Durametallic Corpora-
tion, Foster Wheeler Corporation,
Garlock Inc., General Electric Compa-
ny, General Refractories, Georgia–Pa-
cific Corporation, Goulds Pumps, Inc.,
Green, Tweed & Company, Hajoca
Plumbing Supply Company, Hercules
Chemical Co., I.M.O. Industries, Inc.,
Ingersoll Rand Co., ITT Corporation,
J.A. Sexauer Manufacturing Co., J.H.
France Refractories Co., J.P. Stevens,
Inc., Melrath Gasket, Inc., Metropoli-
tan Life Insurance Co., Owens–Illi-
nois, Inc., Pecora Corporation, Rapid
American Corporation, Rhone–Pou-
lenc, Riley Stoker Corporation, Sepco
Corporation, Inc., Sid Harvey Midat-
lantic, Inc., Union Carbide Corpora-
tion, Viking Pump, Inc., Warren
Pump Company, Weil McLain Co., Vi-
acom/Westinghouse Electric Corpora-
tion, Appellees.

Appeal of Patricia Linster.

Superior Court of Pennsylvania.

Argued Jan. 11, 2011.
Filed April 21, 2011.
Reargument Denied June 24, 2011.

Steven J. Cooperstein, Philadelphia, for appellant.

Jagan N. Ranjan, Pittsburgh, appellee.

BEFORE: STEVENS, P.J., FREEDBERG, and PLATT *, JJ.

* Retired Senior Judge assigned to the Superior Court.

1. As the trial court indicated in its Opinion, the Linsters brought suit against forty-nine defendants, including Crane Company. All defendants have been dismissed, granted summary judgment, or settled with the Linsters. On appeal, the Linsters present arguments challenging only the grant of summary judgment in favor of Crane Company.

## OPINION BY STEVENS, P.J.:

Following settlement and entry of judgment with regard to the last remaining defendant in a mass asbestos products liability action, Appellant Patricia Linster, as Executrix of the Estate of her husband, Matthew Linster, and individually as widow in her own right, presents challenges to the order entered in the Court of Common Pleas of Philadelphia County granting summary judgment in favor of Crane Company.[1] We vacate the judgment, reverse the order granting summary judgment in favor of Crane Company, and remand for further proceedings.

The relevant facts and procedural history are as follows: On February 17, 2006, Patricia and Matthew Linster, as husband and wife, filed a civil complaint against numerous companies, including Crane Company, alleging Mr. Linster developed malignant mesothelioma [2] as a result of his occupational exposure to asbestos products over the course of his employment at the Philadelphia Naval Shipyard (hereinafter Naval Shipyard) from 1966 to 1979. The Linsters specifically averred Crane Company "at all times material hereto, . . . manufactured, produced and sold, either directly or indirectly, in the geographical area in which [Mr. Linster] worked and/or to the employers of the [Mr. Linster] and/or to contractors on job sites on which [Mr. Linster] worked, asbestos products[.]" Linsters' Complaint filed 2/17/06 at 3.

2. "Mesothelioma is a malignancy involving the covering of the lung or the lining of the pleural and abdominal cavities; it is a rare disease associated with exposure to asbestos." *Daley v. A.W. Chesterton, Inc.*, 971 A.2d 1258, 1259 n. 1 (Pa.Super.2009), *appeal granted*, 994 A.2d 1078 (Pa.2010) (citations omitted).

On May 11, 2006, Mr. Linster died from malignant pleural mesothelioma, and Mrs. Linster was appointed the Executrix of Mr. Linster's estate. Mrs. Linster filed a suggestion of death and praecipe to substitute party, as a result of which, by court order filed on June 28, 2006, she was substituted as a party-plaintiff in the matter and advanced wrongful death and survival claims.[3]

Following the completion of discovery, on January 9, 2008, Crane Company filed a motion for summary judgment averring, *inter alia*, that there was no evidence of record establishing that Mr. Linster was exposed to any asbestos-containing product manufactured or supplied by Crane Company during Mr. Linster's employment at the Naval Shipyard. Specifically, Crane Company averred that Mr. Linster failed to identify any product attributable to Crane Company. Crane Company's Motion for Summary Judgment filed 4/22/08 at 1. Moreover, Crane Company averred "[a]lthough 'Crane' pumps, packing, and gasket material were identified by Mr. Linster's co-workers, Richard Aurite and Patrick Gallagher, there is no evidence that Mr. Linster ever worked on or in the vicinity of others who worked on the identified products. Additionally, the testimony does not establish that the products were actually manufactured and/or supplied by Crane Company." Crane Company's Motion for Summary Judgment filed 4/22/08 at 1. Therefore, Crane Company argued that the Linsters failed to establish essential elements of their *prima facie* case, i.e. product identification and causation. *See id.*

The Linsters filed a motion in opposition to summary judgment as it relates to Crane Company averring, *inter alia*, that they met their burden of establishing that

Mr. Linster's injuries were caused by Crane Company's asbestos containing products, i.e., packing and pumps. In so arguing, the Linsters relied on the deposition testimony of Mr. Linster, as well as the testimony of his co-workers, Robert Craven, Patrick Gallagher, and Richard Aurite. The Linsters also attached as an exhibit the affidavit of Mr. Linster, wherein he confirmed that he worked in the same group as Mr. Craven for approximately thirteen years utilizing the same products and materials. Moreover, the Linsters noted that, in its Answers to Interrogatories and Responses to Requests for Production, Crane Company admitted that it manufactured asbestos-containing packing and pumps during the timeframe of Mr. Linster's employment at the Naval Shipyard.

Crane Company filed a reply to the Linsters' motion in opposition to summary judgment. Therein, Crane Company averred, *inter alia*, that Mr. Craven's deposition testimony was inadmissible hearsay under Pa.R.E. 804(b)(1). Specifically, Crane Company averred that Mr. Craven's deposition was given in connection with Mr. Craven's civil lawsuit and, since Mr. Craven was now deceased, Crane Company did not have an opportunity to cross-examine Mr. Craven in connection with Mr. Linster's specific claims. Crane Company further averred that, in considering Mr. Linster's, Mr. Gallagher's, and Mr. Aurite's depositions, the Linsters did not meet their burden of establishing that any asbestos-containing Crane Company product caused Mr. Linster's injuries. The Linsters filed a reply, to which Crane Company filed a sur-reply.

By order entered on July 7, 2008, the trial court granted Crane Company's mo-

---

**3.** For ease of discussion, although Mr. Linster is deceased, we shall continue to refer to the Linsters collectively when appropriate to do so.

tion for summary judgment and dismissed with prejudice all claims and cross-claims against Crane Company. On July 15, 2008, the trial court placed on the docket an entry indicating that the remaining defendants had settled prior to trial, and on August 7, 2008, the Linsters filed a notice of appeal indicating that they were appealing the grant of summary judgment as to Allied Signal, Inc., Bayer Cropscience, Inc., Buffalo Pump Company, Crane Company, Durabla, and CBS Corporation. On August 26, 2008, the trial court directed the Linsters to file a Pa.R.A.P. 1925(b) statement, the Linsters filed a timely Pa. R.A.P. 1925(b) statement, and the trial court filed a responsive Pa.R.A.P. 1925(a) Opinion.

In their appellate brief, the Linsters present arguments challenging only the grant of summary judgment in favor of Crane Company:

> Pennsylvania law provides that summary judgment may be granted only in those cases in which the record clearly shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. The moving party has the burden of proving that no genuine issues of material fact exist. In determining whether to grant summary judgment, the trial court must view the record in the light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Thus, summary judgment is proper only when the uncontroverted allegations in the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. In sum, only when the facts are so clear that reasonable minds cannot differ, may a

trial court properly enter summary judgment.

> As already noted, on appeal from a grant of summary judgment, we must examine the record in a light most favorable to the non-moving party. With regard to questions of law, an appellate court's scope of review is plenary. The Superior Court will reverse a grant of summary judgment only if the trial court has committed an error of law or abused its discretion. Judicial discretion requires action in conformity with law based on the facts and circumstances before the trial court after hearing and consideration.

*Gutteridge v. A.P. Green Services, Inc.,* 804 A.2d 643, 651 (Pa.Super.2002) (citations omitted). *See Weible v. Allied Signal, Inc.,* 963 A.2d 521 (Pa.Super.2008).

Regarding the entry of summary judgment in favor of Crane Company, the Linsters allege they presented evidence establishing a genuine issue of material fact that Mr. Linster inhaled fibers shed by Crane Company's products on a frequent, regular, and proximate basis.

■ In Pennsylvania, a plaintiff who suffers an asbestos related injury is not required to establish the specific role played by each individual asbestos fiber within the body; nor must the plaintiff quantify the specific level or duration of his asbestos exposure. *Andaloro v. Armstrong World Industries, Inc.,* 799 A.2d 71, 86 (Pa.Super.2002). Instead, in order to make out a prima facie case, it is well established that the plaintiff must present evidence that he inhaled *some* asbestos fibers shed by the specific manufacturer's product. *Id.* In assessing a plaintiff's evidence, Pennsylvania courts employ the frequency, regularity and proximity test. *Tarzia v. American Standard,* 952 A.2d 1170, 1171–72 (Pa.Super.2008) (en banc).

▇ The frequency, regularity and proximity test is not a rigid test with an absolute threshold necessary to support liability. *Gregg v. V–J Auto Parts Co.*, 596 Pa. 274, 943 A.2d 216, 225 (2007). Rather, application of the test should be tailored to the facts and circumstances of the case; for example, its application should become "somewhat less critical" where the plaintiff puts forth specific evidence of exposure to a defendant's product. *Id.* Similarly, the frequency and regularity prongs become less cumbersome when dealing with cases involving diseases, like mesothelioma, which can develop after only minor exposures to asbestos fibers. *Id.*

Regarding the entry of summary judgment in favor of Crane Company, we begin with an examination of the relevant portions of Mr. Linster's videotaped deposition. Specifically, during his February 27, 2006 deposition, Mr. Linster indicated that, in 1966, he began working at the Naval Shipyard as a mechanic's helper, and in 1970, he began working as a marine machinist. Videotaped Deposition of Matthew Linster, dated 2/27/06, at 14–15. Mr. Linster worked second shift at the Naval Shipyard for thirteen years (from 1966 to 1979), and during that time, he was exposed to asbestos from asbestos block, asbestos cloth, asbestos gasket material, asbestos brake linings, asbestos pipe coverings for steam valves, and asbestos packing for valves. *Id.* at 17–19, 21–24, 36. Mr. Linster worked on numerous ships, including the Iowa, the New Jersey, the Wisconsin, the Saratoga, and the Adams, and although he worked on areas all over the ships, he primarily worked in the engine and fire rooms where there was poor ventilation. *Id.* at 14–15, 40. Mr. Linster worked in cramped conditions "on top of" other tradesmen, including boilermaker mechanics. *Id.* at 16–17. Mr. Linster was part of a team, which included co-workers Robert Craven, Paul Carr, Robert Clemson, and John Land. *Id.* at 19, 38. Regarding gaskets, he used asbestos gaskets on the steam valves. *Id.* at 31. Mr. Linster testified as follows:

**Q:** Did you ever use any packing?

**A:** Yes, I did.

**MR. HOWARTH:** Objection to form.

**THE WITNESS:** Plain and wiring inserted packing for valves.

**Q:** How often did you use that?

**A:** When we were working on valves, if there was time to pack them, every day.

**Q:** Okay. And do you know if that contained asbestos?

**A:** Yes, it did.

**Q:** Do you know who made it?

**A:** No, I don't.

**MR. HOWARTH:** Objection, foundation.

**Q:** How often would you work on valves in a typical week at the shipyard?

**A:** Seven days a week, five days, six, seven days, depending on how many days a week we were working. Bob Craven and myself and Clemson, we wound up basically becoming what you would call a valve man. A valve that had to be overhauled.

**Q:** And you would use asbestos packing for that?

**A:** Yes.

**Q:** And did you use the asbestos gaskets on those?

**A:** Yes.

**Q:** Did you have to cut the packing at all when you use that?

**A:** Yes, we did.

**Q:** Did that create any dust?

**A:** Well, when you were cutting it, it was a dry material and you would be cutting it and any kind of a breeze or anything at all, you had this stuff blow-

ing up in air. You would have it on your hands and everything else.

**Q:** So you would breathe that in?

**A:** Yes.

*Id.* at 36–37.

The only manufacturer Mr. Linster remembered was Garlock, which made sheet metal to make gaskets. *Id.* at 22–23.

In addition to Mr. Linster's deposition, the Linsters offered the deposition testimony of, among others, Patrick Gallagher. Specifically, during his deposition, Mr. Gallagher testified he worked at the Naval Shipyard from 1976 to 1995. Videotaped Deposition of Patrick Gallagher, dated 3/27/08, at 16. During the early part of his employment, Mr. Gallagher was a boilermaker mechanic at the same time Mr. Linster was a marine machinist. *Id.* at 23. Mr. Gallagher indicated that his shift overlapped with Mr. Linster's shift "many times" and they would work in the same spaces, i.e., the fire and engine rooms. *Id.* at 25. He specifically remembered working "right beside" Mr. Linster on the Saratoga. *Id.* at 23–26. Regarding working with Mr. Linster, Mr. Gallagher specifically testified as follows:

**Q:** The time frame that you actually worked either with or around Mr. Linster is from 1976, when you started, until 1979, or in that area when he left, correct?

**A:** Yes.

**Q:** You told us you didn't work with him on the same jobs; is that correct? You would be in the same areas, but you weren't doing the same job?

**A:** We would be on the same ship if we were shipboard, and be in the same space. I thought I defined what I meant by space depending on the class of the ship. You have fire rooms, engine rooms, pump rooms. We would be in that same space.

**Q:** Am I correct that you're not in the same space with him your whole eight-hour shift every day the whole year?

**A:** That's correct. He was just a fellow worker. We weren't teamed up as partners. We worked together.

**Q:** So, at times you would be in the same space, and times you wouldn't be in the same space?

**A:** Correct.

**Q:** And in this space there were other trades, other than your trade, and Mr. Linster's trade, correct?

**A:** Yes.

**Q:** And all of those other trades were also going about doing their own jobs?

**A:** Yes.

*Id.* at 194–197.

As a boilermaker mechanic, Mr. Gallagher used asbestos materials, including "gasket material, cement for installing the brick, [and] the brick themselves[.]" *Id.* at 41–42. Mr. Gallagher knew the materials contained asbestos because it would so indicate on the ships' prints. *Id.* at 42. Mr. Gallagher used asbestos gaskets, *Id.* at 41–44, and testified as follows with regard thereto:

**Q:** Where did you get the gaskets from?

**A:** From our supply system.

**Q:** Were there any specific manufacturers of the asbestos gaskets that you can recall?

**A:** There were many, Flexitallic, Garlock. There was a lot of gasket materials—Crane.

**Q:** What did you have to do to install these gaskets?

**A:** Whatever was necessary. Sometimes we had to punch holes in them, you know, as far as—for casings we would have to punch holes in them to line up. For insulation it would be taking asbestos product out of a bag, pour

it into a bucket, mixing it with water. With cement taking it out of a bag, putting it in a bucket, mixing it with water, and installing it.

**Q:** I'm going to ask you more about that in a minute.

You talked about punching holes in the gaskets. When you did that, did that create any dust?

**MS. BUSCH:** Objection.

**THE WITNESS:** Right. It does. And it gets all over your clothes.

**Q:** Did you ever do that when Matt Linster was in the area?

**A:** Sure.

**MR. JANICZEK:** Objection, leading.

**Q:** Did you ever see him working with gasket material?

**MS. BUSCH:** Objection.

**THE WITNESS:** We worked together on cleaning out the flanges on the covers from the reduction gear, where the covers come down to meet the bottom plate. In between there is gasket, and when the cover comes off it leaves some of the gasket on the bottom layer, and it all had to be wire brushed off.

**Q:** Did that create dust?

**MS. BUSCH:** Just note my objection. Move to strike as nonresponsive.

**THE WITNESS:** It creates dust.

*Id.* at 44–45.

During his employment, Mr. Gallagher used packing material. *Id.* at 61. He explained that every valve has packing material in it. *Id.* at 61. The valves would generally arrive with packing material in it; however, the boilermaker mechanics would take the valve apart and install new packing material to meet the Navy's specifications. *Id.* at 61. With regard to taking apart the valves to repack them, Mr. Gallagher testified that the valves were usually repacked and rebuilt in the shop,

*Id.* at 205–206; however, "[v]ery often though they have to be repacked again back when they're out on the ship. That's not something that is unusual. It's done quite often." *Id.* at 69.

Mr. Gallagher used Hajoca valves and packing material manufactured by Chesterton, Crane, and Black Cat. *Id.* at 62–68. Mr. Gallagher indicated that "packing has asbestos in it," and in particular, the Crane packing contained asbestos. *Id.* at 208. He knew this because it was called for on the job's plan. *Id.* at 70. With regard to the packing material, Mr. Gallagher testified as follows:

**Q:** Now, you previously have been talking about Hajoca [prepared] valves with packing in them. Do you know whether it was the same type of packing in those valves?

**MS. SCIACCA:** Objection, leading.

**Q:** You can answer.

**A:** I don't know whether it was the exact manufacturer, but it was whatever Hajoca used in their valves. I'm sure it was—we didn't always use the same packing that came. We would use our own.

**Q:** Are there other manufacturers of packing that you can recall?

**A:** Oh, yeah. Crane was another packing big one. Black Cat was another one.

**Q:** Do you know whether Matt Linster would have also used the Crane or Black Cat packing?

**MS. BUSCH:** Objection, leading, lack of foundation.

**THE WITNESS:** Any time it's in the Navy stock system, and you need packing material, you're going to get that, yeah. You'll receive this type of material.

*Id.* at 68–69.

With regard to the valve packing, Mr. Gallagher admitted that, when he went to

the storeroom to get packing, he did not know which manufacturer's packing he was receiving. *Id.* at 206–212. That is, the valve packing, no matter who manufactured it, was used interchangeably and not identified by name when it was handed out at the storeroom. *Id.* at 210–212. However, Mr. Gallagher reiterated that Crane was one of the suppliers of asbestos valve packing materials. *Id.* at 210–212.

The Linsters also offered the deposition testimony of Richard A. Aurite, Jr. Specifically, during his videotaped deposition, Mr. Aurite testified that he worked at the Naval Shipyard from 1971 to 1995, and he worked with Mr. Linster as a marine machinist from late 1976 to 1979. Videotaped Deposition of Richard A. Aurite, Jr., dated 3/14/08, at 14–15, 61. Mr. Aurite recalled working in the same vicinity "numerous times" with Mr. Linster, and in fact, they performed similar jobs on the second shift for four or five years. *Id.* at 20–21. With regard to Crane products, after looking at a list of manufacturers, Mr. Aurite testified that he remembered installing and repairing Crane pumps, and he observed Mr. Linster doing so as well. *Id.* at 22–25, 37–39. However, Mr. Aurite admitted that he had no personal knowledge as to whether Crane pumps contained any asbestos components. *Id.* at 161–162.

Mr. Aurite did not remember using Crane gaskets; however, he used Crane packing material, which was a square or chevron "rope-like" shape. *Id.* at 206–208. The packing material was used to seal shafts inside of the pumps. *Id.* at 206, 208. Sometimes the packing came with the Crane pump and sometimes it was provided separately by the shop store. *Id.* at 209, 212. When Mr. Aurite went to the shop store to get packing, it was given to him in a brown box with the name "Crane" on it. *Id.* at 212–13. As to whether the packing contained asbestos, Mr. Aurite testified that some of the Crane packing contained asbestos because it was used for high temperature. *Id.* at 216–219. Mr. Aurite admitted that, in addition to Crane, the shop room stocked other manufacturers' packing material, and the packing was distributed by the shop store interchangeably. *Id.* at 227. That is, while a machinist would specify whether they required high temperature or non-high temperature packing, they would not ask for a particular manufacturer's packing. *Id.* at 227–28. As far as whether any dust was created by cutting the Crane packing, Mr. Aurite indicated, "Minimal, but yes." *Id.* at 226.

■ Based on the aforementioned, we conclude that, through the deposition testimony of Mr. Linster, Mr. Gallagher, and Mr. Aurite, the Linsters presented a genuine issue of material fact establishing that Mr. Linster breathed in asbestos fibers from gaskets and packing material manufactured by Crane.[4]

For instance, Mr. Linster testified he worked as a marine machinist on second shift at the Naval Shipyard from 1966 to 1979. During this time, Mr. Linster worked in cramped conditions "on top of" other tradesmen, including boilermaker mechanics. Mr. Linster was exposed to asbestos from, *inter alia*, gaskets. Mr.

---

4. We note that, in the lower court, the Linsters also presented the videotaped deposition testimony of Robert W. Craven, which was given in an unrelated case. However, in ruling on Crane Company's motion for summary judgment, the trial court refused to consider Mr. Craven's deposition on the basis it constituted inadmissible hearsay pursuant to Pa. R.E. 804(b)(1). On appeal, the Linsters argue the lower court erred in excluding Mr. Craven's deposition. In light of our analysis and conclusions as more fully discussed *infra*, we find it unnecessary to determine whether the lower court should have considered Mr. Craven's deposition testimony in ruling on Crane Company's motion for summary judgment.

Gallagher, who was a boilermaker mechanic, testified that his shift overlapped with Mr. Linster's shift "many times" for approximately three years and they would work in the same spaces. Mr. Gallagher recalled three manufacturers he used with regard to asbestos-containing gaskets, including Crane. He indicated that he would create dust, which would get all over his clothes, when he punched a hole in the gasket, and Mr. Linster was in the area when he created this dust.

In addition, to gaskets, Mr. Linster testified he used packing material to re-pack valves, particularly during the latter part of his career when he was a "valve man." Mr. Linster testified he used asbestos-containing packing to pack the valves, and he would breathe in the dust created when he cut the packing. Mr. Gallagher confirmed that he also cut packing for valves during the approximate three years his employment overlapped Mr. Linster's employment. Mr. Gallagher indicated that "very often" he would repack the valves when he was installing them in the field. Mr. Gallagher recalled three types of packing material, including Crane, which was a "big one," and indicated that the Crane packing contained asbestos. Moreover, Mr. Gallagher indicated that Mr. Linster would have used the Crane packing since it was one of the types of packing stocked in the storeroom. Mr. Aurite, who was a marine machinist, worked in the same vicinity as Mr. Linster "numerous times" and performed similar jobs as Mr. Linster on the second shift for four or five years. Mr. Aurite recalled the storeroom stocked asbestos-containing Crane packing material and machinists would be given the different manufacturers' packing materials interchangeably. He confirmed dust was created when workers cut the Crane packing material.

In *Weible v. Allied Signal, Inc.,* 963 A.2d 521 (Pa.Super.2008), the plaintiff suffered from mesothelioma. *Id.* As part of his employment, the plaintiff parked his fleet vehicle in a garage where the mechanics often performed maintenance on vehicles using asbestos-containing brakes, clutches, and gaskets. *Id.* at 527. The plaintiff walked through the garage on a routine basis while the mechanics worked on the vehicles. *Id.* With regard to the Borg–Warner clutches, the mechanics testified that the clutches contained asbestos, and that the plaintiff was in the garage on "multiple occasions" while the clutches were being removed or installed. *Id.* at 529. The mechanics further testified that they used Borg–Warner clutches "regularly," and that the plaintiff was exposed to its dust. *Id.* Although the plaintiff was subjected to multiple, different sources of asbestos, the *Weible* court found that the plaintiff's evidence was sufficient to withstand Borg–Warner's motion for summary judgment. *Id.* at 531.

Also, the *Weible* court rejected the asbestos companies' contention that the mechanics' testimony was too vague to permit the jury to find that the plaintiff was exposed to a particular, identifiable asbestos product on a regular basis. In pertinent part, the *Weible* court stated:

> The general contention in support of summary judgment is that, at best, the evidence establishes only that [the plaintiff] was present while the mechanics worked, but that a jury would be required to speculate to conclude that the mechanics ever regularly worked with any of the identified asbestos products in the presence of [the plaintiff]. On this record, and mindful of the standards governing summary judgment, we find this general contention without merit. The asbestos defendants may have a cogent argument as to why they should not be found liable by a jury. This, however, misses the point at the sum-

mary judgment stage. Pinpoint precision in the proofs may be desired, but it is not required. The record evidence before us concerning the frequency, regularity, and proximity of [the plaintiff's] asserted exposure to the—clutch products entitles a jury to make the necessary inference of a sufficient causal connection between the—clutch products and [the plaintiff's] mesothelioma.

*Weible,* 963 A.2d at 533.

Just as in *Weible,* we conclude the facts and circumstances of the case *sub judice* are sufficient to establish the required product identification and causal connection between Mr. Linster's mesothelioma and Crane brand gaskets and packing. Although he may have worked with other brands (which potentially contained asbestos), this issue relates to the apportionment of liability among co-defendants and does not affect the sufficiency of the Linsters' proof with respect to Crane Company gaskets and packing. *See Weible, supra.* Simply put, given the record before us, we cannot conclude that this case is so clear and free from doubt that Crane Company was entitled to summary judgment as a matter of law. Therefore, viewing the evidence in the light most favorable to the Linsters, as we must under our standard of review, we conclude that they adduced enough evidence in opposition to Crane Company's motion for summary judgment. *See Gutteridge, supra.* Accordingly, we vacate the judgment, reverse the trial court's order granting summary judgment in favor of Crane Company, and remand for further proceedings.

Judgment vacated. Order entered July 7, 2008 granting summary judgment in favor of Crane Company reversed. Case remanded. Jurisdiction relinquished.